# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARLES SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-cv-09915 |
| v. ) | |
| ) | Robert M. Dow, Jr. |
| NORTH CHICAGO POLICE OFFICER ) | |
| RAYMOND HARTMANN, NORTH ) | |
| CHICAGO POLICE OFFICER ) | |
| WILLIAM BOGDALA, THE CITY OF ) | |
| NORTH CHICAGO, MAYOR LEON ) | |
| ROCKINGHAM, JR., and former NORTH ) | |
| CHICAGO CHIEF OF POLICE ) | |
| MICHAEL NEWSOME, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion to dismiss [21] Plaintiff's first amended complaint [19], filed by Defendant Michael Newsome and later joined and adopted by Defendant Leon Rockingham, Jr. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. Background[1]

Plaintiff Charles Smith alleges that Defendants violated his constitutional rights when North Chicago police officer Raymond Hartmann slammed Plaintiff's face into the floor, fracturing his orbital socket and causing brain injuries and permanent vision loss, during the

---

[1] The facts are drawn from Plaintiff's first amended complaint. As noted, for the purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

course of his arrest on December 12, 2011. According to Plaintiff, officers Hartmann and William Bogdala entered his third-floor hotel room at the Sleep Inn in Lake Bluff, Illinois and arrested him in connection with a burglary investigation. With his hands cuffed behind his back, Plaintiff attempted to escape down the hotel stairwell. Officer Hartmann managed to subdue the fleeing suspect. But after doing so, Plaintiff alleges, Officer Hartmann "without justification, slammed Plaintiff's face and head into the flooring of the landing in the stairwell" while Officer Bogdala "failed to intervene and in fact encouraged [Hartmann's] use of excessive force." Plaintiff now sues Hartmann for excessive force in violation of 42 U.S.C. § 1983, assault and battery, and negligence; sues Bogdala for allegedly violating Plaintiff's constitutional rights by failing to protect Plaintiff from Hartmann; and sues the City of North Chicago under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). But, relevant here, Plaintiff's First Amended Complaint ("FAC") also alleges that Police Chief Michael Newsome and Mayor Leon Rockingham, Jr. violated Plaintiff's constitutional rights in their role as supervisors of and final policy makers for (as defined by the City of North Chicago Code of Ordinances) the North Chicago police department.

More specifically, Count V states that Newsome's and Rockingham's awareness of the city's recent history of police brutality, coupled with their failure to take steps to curb what Plaintiff describes as a "crisis of police officers using excessive force," is tantamount to Newsome's and Rockingham's approval of their subordinates' unconstitutional behavior. FAC ¶ 83. Plaintiff alleges that police brutality in North Chicago was so rampant under Newsome's watch (during his five-year tenure as chief, officers filed 88 "use of force forms" to report incidents where a suspect was injured by an officer during the course of arrest) that the NAACP successfully lobbied the police department to issue a "Memorandum of Understanding Between

the City of North Chicago and Minority Coalition," which outlined a number of steps designed to increase the transparency of the department's complaint process and alleviate the epidemic. FAC ¶¶ 54-56. In spite of the written reforms, Plaintiff alleges, Newsome and Rockingham actively concealed police misconduct and deterred officers from reporting the misconduct of their colleagues. FAC ¶ 83. Specifically, Plaintiff contends that Newsome rigged the department's reporting system so that citizen complaints bypassed internal affairs' administrative process and were presented directly to him. FAC ¶ 57. For example, Plaintiff alleges that on September 4, 2011, Officer Hartmann "viciously slammed the face of [a man named] Dennis Carcamo into the ground and into the side of his squad car." FAC ¶ 69. Although Carcamo filed a citizen's complaint the following week, the complaint circumvented internal affairs, enabling Newsome to ignore it; Newsome never responded to the complaint nor disciplined Hartmann. FAC ¶ 70. To deter complaints within the department, Plaintiff claims that Newsome and Rockingham instructed the department's human resources director to reveal the names of confidential complainants, thereby creating a fear among police officers that "their fellow officers and or [Newsome] would harm their physical safety or careers" if they reported a colleague's use of excessive force. FAC ¶¶ 77-78, 83. By doing so, Plaintiff contends, Newsome and Rockingham "fostered a climate which facilitated the physical abuse of arrested individuals" and caused the constitutional violation that he allegedly suffered at the hands of Officer Hartmann. FAC ¶¶ 88-89.

Plaintiff notes that Newsome resigned on February 27, 2012 "[i]n the face of public outcry over police brutality" and amidst accusations that he embezzled $140,000 of assets that had been seized by the department during drug raids. FAC ¶¶ 78, 80. Plaintiff alleges that, prior to his resignation, Newsome was motivated to conceal incidents of police abuse out of fear that

the abusing officers would expose his embezzlement, about which the officers in the department knew either "through second-hand knowledge or direct participation." FAC ¶ 78.

Defendants Newsome and Rockingham now move to dismiss for failure to state a claim.

## II.     Motion to Dismiss Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*,

195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

### A. Failure to State a Claim

Defendants seek dismissal of Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), arguing that Plaintiff's FAC fails to state a constitutional claim against them because it lacks an allegation that they were *personally involved* in Hartmann's alleged use of excessive force. "In order for a supervisor to be liable, they must be personally responsible for the deprivation of the constitutional right." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). "To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)). Defendants argue that Plaintiff merely claims that Defendants "had a custom of not disciplining [their] subordinates," which amounts to "inaction" rather than personal involvement in (or even acquiescence of) Hartmann's alleged transgression. MTD at 5. "There is no evidence that Chief Newsome [or Mayor Rockingham] stood by while the individual officers were going to violate Plaintiff's rights," Defendants say. *Id.*

Plaintiff counters that, even though Defendants may not have physically participated in Hartmann's alleged act of abuse, they should still be liable as a proximate cause of Plaintiff's injuries because "[t]hey established and maintained a practice of allowing the use of excessive force during the detention and/or arrest of accused individuals knowing it would directly cause constitutional harm." Pl. Opp. Br. at 2. Defendants argue that these policy-related accusations may state *Monell* claims against the city, but that they cannot support claims, like this one,

5

premised on supervisory liability. Plaintiff argues that the Third Circuit's 25-year-old decision in *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989), instructs otherwise.

In *Stoneking*, a student sued her school district and its superintendent, as well the principal and assistant principal of her school, for violations of Section 1983, seeking to hold the defendants responsible for the alleged sexual abuse that the plaintiff suffered by the school's band director. 882 F.2d at 722. At summary judgment, evidence demonstrated that other female students had previously complained that the band director had tried to rape or sexually assault them, but in response, the principal merely forbade the band director from having one-on-one contact with female students. *Id.* The evidence in the record also showed that, in total, the principal and assistant principal had received at least five complaints about sexual assaults of female students by other teachers and staff members in the four years leading up to the plaintiff's abuse. *Id.* at 728-29. Yet the defendants recorded these complaints in secret files that they kept at home and discouraged and/or intimidated students and parents from pursuing complaints after lodging them. *Id.* at 729. The plaintiff's theory of liability, accepted by the Third Circuit, was that the defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom" that caused her abuse. *Id.* at 725. Analyzing the plaintiff's claim as one based on a due process right to be free from unjustified intrusions on personal security, the Third Circuit rejected the defendants' claim to qualified immunity because "the constitutional right [the plaintiff] allege[d], to freedom from invasion of her personal security through sexual abuse, was well-established at the time the assault upon her occurred." *Id.* at 726-27. Further, the court determined that it was clearly established in the Third Circuit at the time of the plaintiff's abuse that, although "the mere failure of supervisory officials to act or investigate cannot be the basis of liability," "such officials may not with impunity maintain a

6

custom, practice or usage that communicated condonation or authorization of assaultive behavior." *Id.* at 730. For that reason, the Third Circuit held that the principal and assistant principal were not entitled to qualified immunity. However, the Court determined that the actions of the school's superintendent – who had been informed of some of the complaints – "amount[ed] to mere inaction and insensitivity," and that the record was void of any "affirmative acts" by the superintendent from which the Court could conclude that he tolerated, condoned, or encouraged the sexual misconduct of the teachers. *Id.* at 731. Accordingly, the Third Circuit granted the superintendent's motion for summary judgment. *Id.*

Defendant Newsome argues that *Stoneking* is not the law in the Seventh Circuit – that to be held liable under Section 1983, "there must at least be a showing that the defendant acquiesced in some demonstrable way in the alleged constitutional violation." Newsome Reply Br. at 3. Defendant Rockingham makes the same argument and adds that, even if *Stoneking* is relevant in the Seventh Circuit, its application should be limited "to factual scenarios involving school supervisor's policies that permit physical abuse of student-plaintiffs." Rockingham Reply Br. at 3. Both Defendants contend that Plaintiff is attempting to advance a new theory of liability in the Seventh Circuit, and so even if the Court determines that the rationale of *Stoneking* does apply in the police-excessive-force context, the factual dissimilarities between this case and those in the student-sexual-abuse context shield them from suit by way of qualified immunity.

To begin with, the Court points out that the Seventh Circuit has explicitly recognized the viability of the *Stoneking* theory of liability, at least in the student-abuse context. See *T.E. v. Grindle*, 599 F.3d 583, 590 (7th Cir. 2010). In *Grindle*, school officials covered up numerous complaints by students of sexual abuse by one of their teachers, after which future victims sued

the principal, alleging that his doing so violated their equal protection rights. 599 F.3d at 588-89. Based on the Seventh Circuit's previous citations to *Stoneking*, the Court rejected the principal's claim to qualified immunity because "a reasonable school principal would have concluded that she could be held liable for turning a blind eye to and affirmatively covering up evidence of child sexual abuse by one of her teachers." *Id.* at 590. And in affirming the district court's denial of the principal's motion for summary judgment, the Seventh Circuit said that:

> It is important to note that, as in *Stoneking*, plaintiffs are not relying on a theory that mere failure of supervisory officials to act violates the Due Process Clause. Rather, plaintiffs allege that [the principal] is liable for actively concealing reports of abuse and creating an atmosphere that allowed abuse to flourish. In other words, they argue that [the principal's] own actions deprived them of their constitutional right to bodily harm.

*Id.* The Seventh Circuit did so, it seems, to clarify that its acknowledgement of *Stoneking* did not disturb the well-settled law in this Circuit that supervisors cannot be held liable for Section 1983 violations unless they were personally responsible for the deprivation of a constitutional right.

Although *Stoneking* (or at least *Grindle's* articulation of it) is viable law in the Seventh Circuit, the Court agrees with Defendants that our court of appeals has not had occasion to consider whether the theory of liability recognized in *Stoneking* is cognizable in a case of police brutality. Therefore, Plaintiff is attempting to assert a new theory of excessive force liability here. The Seventh Circuit acknowledged the applicability of *Stoneking* in cases premised on due process violations stemming from invasions of one's personal security through sexual abuse. By contrast, Plaintiff's claim against Defendants here is premised on a violation of his Fourth Amendment rights stemming from allegations of excessive force during an arrest, and Plaintiff is seeking to hold supervisors liable on what is essentially a *Monell*-type theory of liability. So the allegations are different in kind – premised on a different constitutional violation, in an entirely different context, and where a plaintiff can already hold the city responsible for unconstitutional

8

policies/practices/customs that caused him harm. For that reason, the Court is reticent to break ground and proclaim, as Plaintiff urges, that supervisors in a police department, all the way up through a city's mayor, can be held liable for creating a "climate" that enabled an officer to inflict harm on an arrestee, particularly when our court of appeals has not done so. However, the Court need not determine whether *Stoneking* has relevance in the police brutality context (or whether qualified immunity would shield either or both Defendants from liability if it did), because that answer would not affect the Court's ultimate determination on this motion.

As mentioned, *Stoneking* does not disturb the well-settled principle in the Seventh Circuit that a supervisor cannot be held liable for a subordinate's unconstitutional conduct unless a plaintiff demonstrates that the supervisor "kn[e]w about the conduct it, facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." *Matthews*, 675 F.3d at 708. Here, for the purpose of surviving a motion to dismiss, Plaintiff has done that with respect to Police Chief Newsome. Plaintiff alleges that on September 4, 2011 – just three months prior to the incident about which Plaintiff complains – Officer Hartmann "viciously slammed" a suspect's face into the ground and into the side of his squad car. FAC ¶ 69. The victim filed a citizen's complaint the following week, but Police Chief Newsome ensured that the complaint bypassed the internal affairs protocol, and came straight to his desk. FAC ¶ 70. Because it did, Newsome was able to ignore the complaint and allow Officer Hartmann to go undisciplined. FAC ¶ 70. Drawing all reasonable inferences in Plaintiff's favor, the FAC suggests that Newsome did this to ensure that Hartmann would not retaliate and expose Newsome's embezzlement. FAC ¶ 79. Taking the facts in the light most favorable to Plaintiff, Newsome condoned Hartmann's practice of abusive treatment (*i.e.,* viciously slamming the faces of arrestees) and, by covering up the citizen's complaint, signaled to Hartmann that similar actions

would be of no consequence in the future. In that sense, it reasonably can be said that Newsome was "personally responsible for the deprivation of the constitutional right" of which Plaintiff complains – Hartmann's smashing of *Plaintiff's* face just a few months later. See *Matthews*, 675 F.3d at 708. Irrespective of some amorphous custom, practice, or policy that Plaintiff alleges that Newsome instituted (and which, Plaintiff argues, supports the application of *Stoneking* here), Newsome, at the very least, turned a blind eye to the precise act complained of by Plaintiff, thereby conveying to Hartmann that he could perform this act with impunity. Newsome therefore facilitated the alleged excessive force inflicted on Plaintiff by Hartmann, and, as such, Plaintiff has stated a Section 1983 claim against Newsome.

Plaintiff, however, has not alleged personal involvement with respect to Mayor Rockingham. Plaintiff contends that Rockingham failed to implement the recommendations commissioned by the NAACP and memorialized in the "Memorandum of Understanding Between the City of North Chicago and Minority Coalition," despite his knowledge of a "practice and pattern among the City of North Chicago's police officers . . . of using excessive force." FAC ¶¶ 2, 26. Plaintiff also alleges that Rockingham, along with Newsome, "prevented officers from reporting misconduct by violating the officers' confidences when they reported this sensitive information." FAC ¶ 4. According to Plaintiff, these acts demonstrate that Rockingham "established and maintained [a] policy of allowing the use of excessive force during the arrest and/or detention of accused individuals with deliberate and reckless indifference to the consequences." FAC ¶ 4. This merely is a *Monell* claim dressed up in *Stoneking* language. See *Rice ex re. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("In order to recovery against a municipal . . . defendant under section 1983, . . . [the plaintiff] must show that his injury was the result of the municipality's . . . official policy or custom."); *Stoneking*, 882 F.2d at

10

725 ("[W]e hold that [the plaintiff] may [maintain a viable section 1983 claim] because she has also alleged that defendants, with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused her constitutional harm.").

In *Grindle*, the Seventh Circuit concluded that the Court's prior references to *Stoneking* precluded the defendants from availing themselves of the protections of qualified immunity. 599 F.3d at 590. But *Grindle* did not dispense with the requirement that, for supervisory liability to attach, a defendant supervisor must have been *personally involved* in the constitutional violation. Mayor Rockingham's alleged failure to institute sweeping corrective measures in the department, such as those promulgated at the behest of the NAACP, amounts to mere inaction, not personal involvement. And the causal connection between Mayor Rockingham's alleged effort to discourage officers from reporting their colleagues by breaching confidences and Hartmann's alleged abuse of Plaintiff is too attenuated for the Court to conclude that Rockingham was "personally involved" in the shattering of Plaintiff's orbital. Plaintiff's argument would have to be that Hartmann abused Plaintiff during his arrest, because he believed that Bogdala (his fellow arresting officer on the scene) would not report his misconduct thanks to Mayor Rockingham's general discouragement of such a practice. Whereas Plaintiff alleges that Police Chief Newsome knew of, condoned, and facilitated Hartmann's abuse of Plaintiff by keeping secret a recent, nearly-identical allegation, Plaintiff's complaint does not even state that Mayor Rockingham was aware of Hartmann's prior face-smashing incident (or that he even knew that Hartmann was a member of the city's police force, for that matter). Accordingly, the Court concludes that Rockingham's actions were too far removed from Plaintiff's incident to say that he was personally involved, and Plaintiff's allegations concerning unconstitutional policies or customs

instituted by the Mayor of North Chicago must be brought as *Monell* claims against the city itself (which, the Court notes, Plaintiff has appropriately done in Count VI of his FAC).

*Stoneking*, even if it did apply in the excessive force context, would not change this result. As mentioned above, the Third Circuit concluded that qualified immunity did not shield from liability the defendant principal – who personally received multiple complaints of sexual misconduct from female students, kept them hidden in secret files, and announced a corrective "policy" to the band director whereby he forbade him from having one-on-one contact with female students. 882 F.2d at 722. However, the Court determined that the superintendent – who was told of some of the complaints, but took no part in the cover up – could not be held liable, because his behavior did not amount to an affirmative act that resulted in the plaintiff's abuse. *Id.* at 731. Here, Mayor Rockingham is more like the superintendent, who at most was aware of complaints of police abuse (by way of lawsuits against the city, if nothing else), than the principal, who actively attempted to hide complaints in a secret file. Although Plaintiff's FAC makes the conclusory allegation that Rockingham and Newsome "approved and condoned the City of North Chicago's police officers using excessive force" by "actively concealing police misconduct," the actual facts that Plaintiff alleges do not support this conclusion with respect to Mayor Rockingham. Again, the FAC is devoid of allegations that Mayor Rockingham covered up (or even knew) of Officer Hartmann's previous face-smashing incident. Therefore, the allegation that Rockingham covered up incidents of police misconduct strikes the Court as a "formulaic recitation" of the language from the case law, and one that does not give Defendant "fair notice of what the * * * claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In short, even under a *Stoneking* theory of liability, Plaintiff would fail to state a claim that Rockingham caused his injuries.

That said, if Plaintiff is in possession of additional factual allegations with respect to Mayor Rockingham that he believes may overcome the deficiencies identified by the Court, he may amend his first amended complaint within 28 days.

## B. Qualified Immunity

At least at this stage of the litigation, Defendant Newsome is not entitled to qualified immunity. "Qualified immunity shields government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011) (internal citations omitted). "When making a qualified immunity determination, a court considers (1) whether the plaintiff's allegations show that the defendant violated a constitutional right, and (2) whether that right was 'clearly established' at the time of defendant's conduct." *Id.* Newsome acknowledges that "qualified immunity is not applicable for direct participants in a Section 1983 action," but argues that Plaintiff's FAC is void of allegations of "individual involvement in the alleged constitutional deprivation" and merely paints him as a non-participant policymaker. Newsome Reply Br. at 4. If the Court were denying Newsome's motion to dismiss on a *Stoneking* theory of liability, this argument may have had some traction. But instead, the Court has determined that Plaintiff's FAC *does* allege that Newsome was personally involved in Plaintiff's alleged constitutional violation in so far as he states a claim that Newsome approved of and facilitated Officer Hartmann's conduct. On December 12, 2011, the date of Plaintiff's alleged injury, it was clearly established that using excessive force to effectuate an arrest violated an arrestee's Fourth Amendment rights, (see *e.g., Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009)), and that supervisors who approved, condoned, or facilitated a subordinate officer's use of that force also violates the

arrestee's constitutional rights (See *Jones*, 856 F.2d at 992-93). Accordingly, taking Plaintiff's allegations as true as we must, the Court rejects Newsome's claim to qualified immunity at this time.

**IV.     Conclusion**

For the reasons stated above, Defendants' motion to dismiss [21] is granted as to Defendant Rockingham but denied as to Defendant Newsome. If Plaintiff is in possession of additional factual allegations with respect to Mayor Rockingham that he believes may overcome the deficiencies identified by the Court, he may amend his first amended complaint within 28 days.

Dated:  May 22, 2014

Robert M. Dow, Jr.
United States District Judge